Good morning. Would you like to reserve some time for rebuttal? I would, please. How much? Five minutes. Very good. Go ahead, please. May it please the court, can you hear me? Yes. My name is Lauren Kiva. I represent the appellant Elin Shainman. It's my privilege to be in this court. I clerked for two federal judges on three courts, including the Ninth Circuit, a number of years ago. It has been my experience, both on the clerk side and on the appellate argument side, that this is a time for us to discuss the issues that you see and that concern you. I'll start by the preface that Elin Shainman was a bankruptcy trustee with an unblemished record for 27 years. She served as president of the American Association of Bankruptcy Trustees with great distinction and with great integrity. She started in the probate court over in Marin County, where a probate judge found that a post-marital agreement that was entered into freely between her and her husband was somehow tainted by fraud. That is a tentative decision. It has not been appealed. That is what it is entitled to. The bankruptcy court took that tentative decision and Ms. Shainman's concession that solely for purposes of the bankruptcy proceeding, the post-marital agreement was not valid. That was the only thing that she agreed to. The bankruptcy court then turned that into a series of congeries of errors that went spiraling down to the point where the U.S. trustee relied upon those errors to disqualify her from service as a U.S. trustee. That's part one of our argument. Part two of our argument is that she applied for a loan. At the request of the Small Business Administration, who sent her a notice saying please apply for the loan, she applied for the loan. It had a form. It had contingent liabilities, period. It didn't tell her what that meant. She did not believe that there was any contingent liability associated with the probate court proceeding. Her lawyers had submitted a brief that told her there was no liability. And if you look at the pillars there's no liability. There's no contingent liability or two very different things. There could be a liability contingent on her losing the case, right? There could be a contingent liability, but you have to take a look at Judge Posner's decision cited in our ruling. A contingent liability depends on a whole bunch of contingencies. And if you don't believe that actually it's going to occur, you have no obligation to do it. And the SBA knows that because there are other forms that make it quite clear when asking for other information. Are there any judgments against you? Is there any civil liability? No. If you fill out a bankruptcy schedule, you only have to list judgments. You know, under your definition, you wouldn't have to list anything that's, you know, even a contingent liability. First of all, I have to apologize. I am not a bankruptcy practitioner. So any advice I give you on bankruptcy — But Ms. Shoneman has been a bankruptcy trustee for, as you said, many, many years, right? Correct. Okay. The point is that she did not believe that she had an obligation to put that down. And there's no indication in the record whatsoever that the SBA actually relied on that one way or the other. And so my point is that to disqualify somebody for filling out a very opaque form of contingent liabilities and failing to put that pending bankruptcy, excuse me, probate court litigation on it should not be deemed to be a knowing falsehood that would disqualify her from her bankruptcy proceeding. Then you go to her expenditure of the EIDL funds. She spent her funds — she was in Chapter 11 bankruptcy. That's a business bankruptcy. She was being attacked at her business by her stepson, former stepson. And as a matter of law, if you take a look at the cases we've cited, I believe she had every right, indeed an obligation, to spend those funds on bankruptcy counsel to defend herself in that. And the Supreme Court has made it quite — How do you get bankruptcy court approval? You can't — a debtor in possession can't hire a lawyer or pay a lawyer without bankruptcy court approval. You're absolutely right. And she did obtain bankruptcy court approval to retain her lawyers. And obviously, lawyers are going to get paid. And so the funds, as a matter of law, were fungible. There was no restriction on her ability to use those funds. But the bankruptcy court did say that you must not use these loan proceeds for any prohibited — any unpermitted purpose, right? That was after a question was raised as to her expenditure. As a matter of fact, the U.S. Treasury Bureau is somebody who raised the issue. And her own counsel approached the bankruptcy court and said, we would like some guidance on this. And the bankruptcy court itself said the regulation, quote, working capital, is less than clear. And there was an extensive discussion between Ms. Shainman, the U.S. trustee, and the bankruptcy court, who said, I'm not — I can't give you any further advice or guidance. It's simply, quote, working capital. Well, I believe as a matter of law, you can spend working capital to hire lawyers to defend yourself in a court of law if that's part of your business, period. But this was — I mean, you've sort of made the point that this wasn't part of her business, that this was a personal matter between her and her late husband and his children by a former marriage. The point is — That litigation didn't have to do with her work as a trustee, right? They were attacking her business. The probate court entered an order at the request of her stepson that valued her bankruptcy practice at $1 million. And he sought to — sought to take that over. Now, that was clearly erroneous because you can't value a bankruptcy business. It's a personal attribute. And so — but the bottom line, she was in, as I understand it — and I apologize because I'm not a bankruptcy lawyer, but my understanding is Chapter 11 is a business bankruptcy. And if you're in a Chapter 11 business bankruptcy, you have a right to retain counsel and to pay counsel from funds that you have. And so what we are asking this court to do is to take a careful look at the record. I'm also a member of the New York Bar, and there was a rule in the New York Supreme Court, the level court, that says that you put everything in your brief, and when you get to court, you don't argue anything in your brief, at which point I would ask the judge, well, why am I here? Because it's all in my brief. It is all in my brief. And unless the court has any further questions of me at this point, I would like to reserve the rest of my time. There was sort of a second argument that I thought you were making, too, OK? Excuse me, could you speak — I'm sorry. Here, you seem to be arguing there was no cause. And in your brief, though, you were arguing that the cause had to be — if there was cause, it would have to be related to her role as a trustee. I'm actually making two points. The first point is the one you just stated, Your Honor. It has to be related to her actions as a trustee. And there is nothing in this record, the U.S. trustee has conceded, there is nothing in her unblemished record that would cause the bankruptcy court, who itself admitted there is no — this is a case of — OK. Let's go to this point, whether there is cause, but does the cause have to be related to her duties as a trustee? But aren't you, in essence, asking us in that case to interpret the language of Section 324A so the unqualified term cause should be applied in only limited circumstances? Yes and no. Yes, in the sense that I believe the cases are uniform. There has been disqualification removal only when the conduct in issue fundamentally affected the trustee's duties, character as a trustee. But those cases don't say — that's because those were the facts that the parties were presented with. Maybe this fact pattern hasn't come up before, but where in the statute — how do you get from the statute that doesn't define cause or doesn't limit cause to say that it should be limited? I believe you take the gloss applied to the statute by the courts and you apply the fact situations there. I will concede, Your Honor, that I can think of all sorts of things outside a trustee's duties as a trustee that would be, quote, cause under the statute. My point is that under the facts here, inside or outside of her duties as a trustee, there is no cause. And frankly, the bankruptcy court, despite its distinguished career, got it wrong. OK. All right. Thank you. I'll let you reserve. Thank you. Mr. Golden. Good morning. May it please the Court. My name is Cameron Golden, appearing on behalf of Appley, the United States trustee. Removal of a trustee for the general term of cause is left to the sound discretion of the bankruptcy court under a broad totality of the circumstances test. And here we have a Chapter VII trustee who was a fiduciary, like all Chapter VII trustees are, held to the highest standard of conduct and required to possess integrity and good moral character. In this case, either the misconduct of Ms. Schaman involving her late husband and his estate or her misconduct related to the COVID loan of $924,000 obtained from the SBA were sufficient grounds for cause. Let me stop you and focus, first of all, on the probate court decision. The bankruptcy court didn't make any independent findings along the lines of what the probate court found, correct? That is correct, Judge. It relied on the probate courts. Then I have a real problem with the preclusive effect because it's a tentative decision. And actually, the California rules of court say it's not even a judgment, let alone a final judgment. So how can a non-final tentative decision have issue preclusive effect? A few points on that, Your Honor. First of all, we do feel it was final for purposes of issue preclusion, as we state in our brief, not final and appealable, but final meaning sufficiently firm so as to be accorded a preclusive effect. It was the result of a 10-day trial with witnesses, exhibits, including the testimony of Ms. Schaman herself. And it would have become final had Ms. Schaman, not two days before it would have become final, filed bankruptcy to invoke the automatic stay. Well, you know, the concern I have about that is the probate court under the California court rule specifically said, let me know if you have a problem with any of this. You know, there's this opportunity to object. So it's almost like on its face the California court wasn't done. It was following the court rule 3.1590 that gives parties 15 days to object. Ms. Schaman did not object, but instead she filed bankruptcy. In any event, the district court did affirm on the issue of issue preclusion regarding the quiet title action. So it's already went through all the analysis except for the one that you raised, Judge Ferris, finality. And the district court found that their failure to raise the finality issue was consistent with their position below where Ms. Schaman agreed to be bound by the probate decision for her own benefit. She was actually very careful about that. She was bound by the, she agreed to be bound by the result. She did agree to be bound by the results for her benefit when the heirs attempted to have the automatic stay lifted for the decision to become final. And in any event, even if this court weren't determined, issue preclusion doesn't apply on, the bankruptcy court didn't abuse its discretion in considering the underlying facts as part of its totality of circumstances analysis. In regards to the COVID loan, this court picked up on a couple of key points in terms of, first of all, contingent liabilities. Ms. Schaman, as a trustee, certainly reviewed many schedules, EF for contingent liabilities, where you check the box, contingent. In fact, in her own bankruptcy case, she listed contingent liabilities. And in fact, she listed these exact contingent liabilities, though she did not list them when applying for the COVID loan. There are two parts I'll refer to generally as the expenditure of the COVID loan. The first $419,000 she used to pay her professionals, her probate attorneys, accountants, her retainer to file her own bankruptcy case, had absolutely nothing to do with any business. So not only was the application itself untruthful, the loan agreement whereby she agreed to use these public funds solely as working capital to alleviate the economic effects of disaster of COVID-19, she did not use them for that purpose. She used them to litigate and to file bankruptcy for at least $419,000. And as Judge Montali said, when she attempted to argue that that was working capital, he found that those excuses were unavailing and not the least bit convincing. It sounds like counsel for the appellant has conceded the cause can be for actions outside of the trustee's job, which makes sense. As Judge Montali said, could she be a bank robber, convicted and still be a trustee? Clearly, we would say not. And also, as Judge Montali said, if Congress had wanted to limit it to conduct only in the trustee's role, it could have done so. Instead, it basically did the opposite and left cause very broad, as the statute itself says. Let me ask you about the mootness point. She's resigned from future assignments, right? Correct. I think it's fair to say that the chances the U.S. trustee put her back on the panel are fairly low. Should this court reverse and find that Judge Montali abused his discretion, Ms. Shaman could be reinstated in the three cases and it would not be moot. I'm talking about more assignments going into the future. I'm breaking it into two pieces. For those, she has resigned from the panel of her own volition. And if she were to reapply, that would be to the U.S. trustee's discretion whether to grant that application, right? Yes, Your Honor. Okay. So for the cases she's in, there's three cases she's still in now. Is that it? Yes, Your Honor. This one and there's two others. Is that right? It's actually not this one. Not this one. It's ACH, Cizan, and Zerker Trust. Uh-huh, uh-huh, uh-huh. Zerker Trust had the cargo property where the judge allowed her to stay in as part of his order until the property was sold, which it was. And you're not complaining about the court allowing her to stay in those cases, correct? No, Your Honor. Okay. So what happens if the removal, what effect does the removal have? What real-world effect does the removal order have at this point? Well, she was removed from three cases, so if this court reversed, she could be put back in those cases. In addition, those three, in addition to the two you've mentioned? There's three, yes, three total. Two, yes. Was it five total? Nope, sorry, three, Zerker Trust, ACH, and Cizan. But she'd be put back into one of those cases if we were to reverse? Or she could be put back in all three. I understand. Thank you. Okay. Sorry for any confusion. I've only got so many fingers, Ira. And I don't know, I was totally unclear by the briefs. It would only become moot then if she was saying regardless of this court's decision, even if this court reverses, she will not be, she will not accept such reappointment. I don't know if that's the case. Does that really make it moot? Because she says that today, but then in two weeks, she could say, well, you know, I'm changing my mind. I would want to go back on the, you know, be on the panel again. It's in her control, so, right? Yes, Your Honor, it could happen. That may not make it moot. Correct. All right. So we just don't know. But since we've gone down this road of mootness, I would be amiss not to at least mention vacature. If this court does determine that it's moot, vacature would not be the appropriate remedy because that's only appropriate when mootness occurs by happenstance or by the unilateral action of the prevailing party below. Here it would be made potentially moot by her own actions, so vacature would not be appropriate. If there are no further questions, I'd just like to conclude the way Judge Montali concluded his analysis, which I will say was very measured. The record reflects very patient. Six months between the filing of our motion and his ruling, 12 cases when Ms. Shaman was in, when we filed it, only three by the time he ruled, which reflects to me great use of discretion, the opposite of an abuse of discretion. But he said any of the actions described, and certainly in tandem, paint a picture in which any reasonable debtor or acquirer would be forced to question whether Ms. Shaman will make financial decisions for the benefit of the estate she administers or for the ultimate benefit of herself. The integrity of the bankruptcy system cannot be so questioned. Obviously, the U.S. circumstances demonstrate that Judge Montali did not abuse his discretion in finding cause for removal from the three cases. Roberts. Okay. Any more questions? Thank you. Thank you very much. Mr. Kiva, you've got five-ish minutes. There we go. Almost six minutes. Unless the Court has any further questions, we wait for their argument. And thank the Court. Okay. Thank you very much. Thank you.
judges: FARIS, BRAND, and CORBIT